# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-12-00544-CR

**Willie James Sauls, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 167TH JUDICIAL DISTRICT
### NO. D-1-DC-11-302177, HONORABLE BOB PERKINS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury found appellant Willie James Sauls guilty of aggravated robbery. *See* Tex. Penal Code § 29.03(a)(3)(A). The trial court found two enhancement allegations to be "true" and sentenced Sauls to forty-five years' imprisonment. In two issues on appeal, Sauls asserts that the trial court erred in denying his *Batson* challenge and that the written judgment improperly states that Sauls entered pleas of true to the enhancement paragraphs. *See* Tex. Code Crim. Proc. art. 35.261; *see also Batson v. Kentucky*, 476 U.S. 79, 88–89 (1986). We will modify the judgment to correct the clerical error and, as modified, affirm the judgment of the trial court.

## BACKGROUND

Sauls allegedly stole the purse of Anna Warren, an 84-year-old woman, as she was entering a department store in Austin, Texas. In the course of committing the theft, Sauls threw Warren and slammed her to the ground. A surveillance video of the incident was released to the

local media, and Sauls's ex-wife identified him from the video. Sauls was arrested at his apartment, waived his *Miranda* rights, and confessed to the robbery.

A jury found Sauls guilty of aggravated robbery of an elderly person. *See* Tex. Penal Code § 29.03(a)(3)(A). The trial court found two enhancement paragraphs to be true and sentenced Sauls to forty-five years in prison. This appeal followed.

## DISCUSSION

In his first issue on appeal, Sauls argues that the trial court erred in denying his *Batson* challenge because the State used one of its peremptory strikes to exclude a juror based on the juror's race. In his second issue, Sauls complains of a clerical error in the judgment which wrongly states that he pleaded true to the enhancement allegations. We discuss these two issues separately.

### *Batson* **Challenge**

In his first issue on appeal, Sauls argues that the State engaged in intentional racial discrimination during jury selection because the State struck a potential juror who complained of being the victim of racial profiling by the police, which, according to Sauls, is not a race-neutral justification for striking a juror. Sauls further argues that even if striking a juror who complains about being racially profiled is deemed a race-neutral reason for a peremptory strike, the State's professed race-neutral reason was a pretext for an otherwise unlawful peremptory challenge.

In *Batson v. Kentucky*, the United States Supreme Court held that a state violates the Equal Protection Clause of the Fourteenth Amendment when it exercises a peremptory strike to exclude a venireperson based solely on race. 476 U.S. at 86; *see also* U.S. Const. amend. XIV, § 1;

2

Tex. Code Crim. Proc. art. 35.261(a) (codifying *Batson*'s prohibition of using peremptory challenges based on race in criminal cases). A challenge to the State's use of a peremptory strike under *Batson* has a three-step, burden-shifting analysis. First, a prima facie case of discrimination must be established by the opponent of the strike. *Nieto v. State*, 365 S.W.3d 673, 675–76 (Tex. Crim. App. 2012). If the party opposing the strike makes this initial showing, the burden shifts to the State to produce a facially non-discriminatory reason for its use of the strike. *Id*. at 675; *see also Purkett v. Elem*, 514 U.S. 765, 768 (1995) ("Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral."). If the State produces a facially non-discriminatory reason for its strike, the burden shifts back to the opponent of the strike to show that the State's proffered reason is a pretext. *Nieto*, 365 S.W.3d at 675. Whether the opponent has satisfied his burden of persuasion to show that the State's facially race-neutral explanation for the strike is not genuine but instead pretextual is a question of fact for the trial court to resolve. *Blackman v. State*, 414 S.W.3d 757, 765 (Tex. Crim. App. 2013).

In reviewing a trial court's ruling on a *Batson* challenge, we consider the entire record from voir dire and are not limited to the specific arguments made to the trial court by the parties. *Nieto*, 365 S.W.3d at 675–76; *Watkins v. State*, 245 S.W.3d 444, 448 (Tex. Crim. App. 2008). We review the trial court's ruling with great deference, reversing only when that conclusion is, in view of the record as a whole, clearly erroneous. *Blackman*, 414 S.W.3d at 765; *Watkins*, 245 S.W.3d at 448; *see also Snyder v. Louisiana*, 552 U.S. 472, 477 (2008) (trial court's ruling in third step must be sustained unless it is clearly erroneous). "To determine whether the fact-finder's decision is 'clearly erroneous,' appellate courts examine the record to see whether the ruling leaves them with the

3

'definite and firm conviction that a mistake has been committed.'" *Guzman v. State*, 85 S.W.3d 242, 254 (Tex. Crim. App. 2002) (quoting *United States v. Fernandez*, 887 F.2d 564, 567 (5th Cir.1989)).

Sauls is an African-American, and no African-Americans served on the jury that convicted him. Within the seventy-member venire panel, only two of the venirepersons were African-American. After the State and defense conducted their voir dire examinations and submitted their strikes for cause and peremptory strikes to the trial court, defense counsel lodged his *Batson* challenge, asserting that the State exercised a peremptory strike on panel member 13[1] on the basis of race because he was the only African-American who was in the "strike zone"[2] and could possibly serve on the jury.

We do not need to address the first prong of the *Batson* analysis; i.e., whether Sauls established a prima facie case of discrimination. "Where the prosecutor has articulated his reasons for the challenged peremptory strike and the trial court has ruled on the ultimate questions of intentional discrimination, [a prima facie case of discrimination] becomes moot." *Young v. State*, 283 S.W.3d 854, 866 (Tex. Crim. App. 2009) (per curiam) (citing *Hernandez v. New York*, 500 U.S. 352 (1991); *Cantu v. State*, 842 S.W.2d 667, 689 (Tex. Crim. App. 1992)). The prosecutor in this case explained why his peremptory strikes were race neutral, and the trial court ruled on the issue.

---

[1] For privacy reasons, we refer to the relevant panel members by number rather than by name. The record reflects that panel member 13 was African-American.

[2] "The strike zone is composed of those venirepersons who were not struck for cause and who could potentially sit on the jury if each side used all of its peremptory strikes and no two peremptory strikes overlapped." *Nieto v. State*, No. 01-09-00226-CR, 2010 WL 5117349, at *1 (Tex. App.—Houston [1st Dist.] Dec. 16, 2010) (mem. op., not designated for publication), *rev'd on other grounds*, 365 S.W.3d 673 (Tex. Crim. App. 2012).

4

Under the second prong of the *Batson* analysis, the burden shifted to the State to offer a race-neutral basis for striking the juror in question. Discriminatory intent must be inherent in the prosecutor's explanation for the explanation not to be race neutral. *Guzman*, 85 S.W.3d at 246. "The second step of this process does not demand an explanation that is persuasive, or even plausible." *Purkett*, 514 U.S. at 767–68. During voir dire, the prosecutor asked the panel members, "[D]oes anybody have a bad experience with peace officers or police officers?" Three venire members volunteered a bad experience with a police officer: panel member 6 (white male); panel member 13 (black male); and panel member 69 (white male). The State used peremptory strikes to exclude panel members 6[3] and 13 from the jury.[4] Panel member 13 told the prosecutor, "I've actually been what I would consider to be profiled several times." He later clarified that he believed it was profiling based on his race. He said that the typical incident involved the police telling him to get out of the car, conducting a search, and then letting him go. He told the prosecutor that he could set those experiences aside for the purposes of this case. After the exchange with panel member 13 regarding his racial profiling experiences, the prosecutor immediately followed up with this question to the whole panel:

> We hear a lot in the news about that, race, criminal justice system, how the two intertwine. Does anybody have strong feelings about race in the criminal justice system, either that police either in this city or in other cities respond disproportionately to ethnic minorities? To religious minorities? Does anybody have any strong feelings like that?

---

[3] Panel member 6 complained of his experience with a disrespectful police officer who was dispatched to the panel member's neighborhood after the panelist called the police about a domestic dispute he witnessed.

[4] Panel member 69 was struck for cause by defense counsel.

Panel member 38, a white male, told the prosecutor, "I think there is a lot of profiling that goes on with minorities. From what I've read, from what I've heard, it just seems that the statistics show that the police tend to profile certainly a lot more in certain neighborhoods." The prosecutor used a peremptory strike against panel member 38 as well.

At the *Batson* hearing, the prosecutor explained that he struck panel member 13 because the panel member stated that he had a bad experience with law enforcement and because "he was the only juror that responded that he had been profiled by the Austin Police Department [APD] and because of the similarities between the presumed profiling agency and arresting agency in our case, we felt it best that there be other more appropriate, more suitable jurors." The prosecutor noted that he also struck panel members 6 and 38, who were Anglo males, because of number 6's "bad feelings just in general with law enforcement" and because of number 38's response that "APD tended to profile, that it was kind of his bad experience that he thought of when talking about race and the criminal justice system." The prosecutor summarized his rationale for the peremptory strike of the three panelists as follows:

> Judge, just in summation . . . they all responded that they could be fair, that they could consider the evidence, but it was just this—from all three, irregardless of race —they all three propounded just kind of a general reluctance to completely trust law enforcement and had somewhat of a negative view about law enforcement in an admittedly quiet exchange from the jury towards the prosecution. That's—we had very limited information from the panel to rely on in making strikes, and those were —all three of those jurors for the reasons stated jumped out to the State as appropriate just because of that generalized reluctance from APD in dealing with APD.

Sauls argues that the State's explanation for exercising its peremptory strike against panel member 13 is not race neutral. We disagree. As we noted in a similar case where a jury

6

panelist was struck after reporting being harassed by a police officer because she was black, "the prosecutor's explanation for the strike was focused on the panelist's experience, not on the panelist's race. That the panelist attributed the alleged police mistreatment to the officer's racial animus did not render the prosecutor's peremptory challenge racially discriminatory." *Anderson v. State*, No. 03-02-00330-CR, 2003 WL 21241356, at *2 (Tex. App.—Austin May 30, 2003, no. pet.) (mem. op., not designated for publication). Similarly, in *Young v. State*, a venire member was struck for several reasons, one of which was because the panelist's "husband and son, both black men, felt like they were—pulled over and apparently more than one time [in] her son's case, and felt like they were victims of racial profiling." 283 S.W.3d at 871. The court of criminal appeals held that the "State's striking of a juror based on her personal or close relative's experiences with or perceptions of law enforcement, particularly one as negative as racial profiling, is not by itself determinative of racial discrimination." *Id.* We conclude that the State has produced a facially non-discriminatory reason for its peremptory strike of panel member 13, namely, his negative prior experiences with, and distrust of, law enforcement. Thus, the State has met its burden for the second prong of the *Batson* analysis.

Under the third prong of the *Batson* analysis, the burden shifted back to the opponent of the strike "to establish by a preponderance of the evidence that the strike was indeed the product of the proponent's purposeful discrimination." *Watkins*, 245 S.W.3d at 447. This third prong of the *Batson* analysis has been characterized as "requiring defendants to prove that the neutral reason offered [by the State] is pretextual." *Miller-El v. Dretke*, 545 U.S. 231, 267 (2005) (Breyer, J., concurring). For the third step of the *Batson* analysis, courts have used the non-exhaustive set of

7

objective factors laid out in *Keeton v. State* to determine if a prosecutor's reason for a peremptory

strike is, in fact, a pretext for racial discrimination.  749 S.W.2d 861, 868 (Tex. Crim. App. 1988);

*see also Williams v. State*, 804 S.W.2d 95, 106 (Tex. Crim. App. 1991) (approving *Keeton* factors

under "clearly erroneous" standard of review); *Whitsey v. State*, 796 S.W.2d 707, 713–14 (Tex.

Crim. App. 1989).  These factors are "useful in making a determination that the State's proffered

race-neutral reasons are supported by the record, as well as the trial court's findings."[5]  *Williams*,

804 S.W.2d at 105–06.  The five factors are:

> 1. The reason given for the peremptory challenge is not related to the facts of the case;
>
> 2. There was a lack of questioning to the challenged juror or a lack of meaningful questions;
>
> 3. Disparate treatment—persons with the same or similar characteristics as the challenged juror were not struck;
>
> 4. Disparate examination of members of the venire, i.e., questioning a challenged juror so as to evoke a certain response without asking the same question of other panel members; and
>
> 5. An explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically.

*Id.* at 106.

Sauls argues that the record shows that the alleged race-neutral reasons offered by

the State are not supported by the record and that the offered reasons were a mere pretext for an

---

[5] Other similar factors have been used more recently by the United States Supreme Court and the court of criminal appeals, but nonetheless, these factors are non-exclusive, and the "collective and cumulative impact" of these factors should be considered.  *See Miller-El v. Dretke*, 545 U.S. 231, 240–64 (2005); *Watkins v. State*, 245 S.W.3d 444, 448–49 & n.23 (Tex. Crim. App. 2008).

unlawful peremptory strike of panel member 13. In particular, Sauls argues that factors one, three, and five are relevant in this case and should be weighed in his favor.

Regarding factor one, Sauls argues that the prosecutor inaccurately claimed that panel member 13 said he was racially profiled by APD, which was the agency involved in the investigation and whose officers would be testifying in this case. The State acknowledges that the record does not conclusively show that panel member 13's experience with racial profiling involved APD. Rather, venire member 13 said that he had grown up in the Austin area, lived there most of his life, and had been racially profiled several times. As Sauls notes, there are many law enforcement agencies besides APD in the Austin area and any one of them could have been the agency about which venire member 13 was referring. Sauls also argues that the record does not reflect the fact that panel members 6, 13, and 38 had a lack of trust for APD or a problem with APD. According to Sauls, none of these struck panelists mentioned APD specifically as the agency with whom they had a bad experience, that APD racially profiled, or that they had a lack of trust for APD. Thus, Sauls asserts that this rationale was a pretext for striking panel member 13 based on his race.

While there are some factual discrepancies and presumptions in the reasons provided by the prosecutor for the peremptory strikes of panel members 6, 13, and 38, the reasons provided by the prosecutor for the strikes are "related to the facts" of the case. Panel member 13 never specifically said it was APD that racially profiled him, but he did say he grew up in the Austin area and had been racially profiled and searched by the police several times. The State could have reasonably assumed that APD—the same agency involved in the case—was the profiling agency referred to by venire member 13. Similarly, venire member 13 never specifically said he had a general

9

distrust of law enforcement, but the State could have reasonably believed that someone who feels like he has been racially profiled and searched by the police several times—and volunteers this as an example of a bad experience with law enforcement—would generally distrust the police. Considering that law enforcement officers investigated the crime and would be testifying at the trial of an African-American defendant, striking panel members who volunteer that they have had bad experiences with law enforcement or who believe that law enforcement officers engage in racial profiling is sufficiently "related to the case."[6]

Regarding factor three, Sauls argues that there was disparate treatment of venire member 13 because other venire members, when asked to rate law enforcement on a scale of one to ten, rated law enforcement lower than him, yet they were not struck by the State and served on the jury. The State notes that the prosecutor offered the fact that he struck panel members 6 and 38—white venire members—as proof of similar treatment to panel member 13, the black venire member. In response, Sauls argues that the prosecutor's proffered reason for striking the white venire members is not supported by the record.

The prosecutor told the venire members:

> I'm going to ask you to rate the law enforcement here in Austin, Texas, in Travis County on a scale of one to ten. One being that law enforcement just generally does an awful job; they hardly ever do anything right; they're slow to respond to calls. Everything up to ten being they do a fantastic job; they almost always do what

---

[6] It should also be noted that mischaracterizing a venireperson's response is insufficient grounds for rebutting a prosecutor's race-neutral explanation: "The trial court is not required to find a *Batson* violation simply because the proffered explanation turns out to be incorrect. Hence, the appellant's contention of pretext based upon an alleged mis-characterization [sic] of [a venireperson's] response is insufficient to rebut the prosecutor's race-neutral explanations." *Young v. State*, 283 S.W.3d 854, 869 (Tex. Crim. App. 2009).

they should be doing; I couldn't ask them really to do a better job—and everything in between.

The prosecutor then proceeded to ask every venire member how he or she rated law enforcement. According to Sauls, the State told the trial court during the *Batson* hearing that venire member 13 rated law enforcement as seven, when in fact he rated it as an eight. This false recitation of the record, according to Sauls, indicates that the State's explanation was a pretext for an otherwise improper peremptory strike. Our reading of the record does not fully comport with Sauls's reading as it pertains to the rating of law enforcement by the venire members. Our review of the record confirms that the prosecutor was correct when he told the judge during the *Batson* hearing that panel member 13 rated law enforcement as a seven. Thus, the record does not support Sauls's assertion that the State misidentified venire member 13's rating of law enforcement.

Sauls also claims that at least two prospective white jurors who rated law enforcement lower than venire member 13 were not struck by the State. While the record shows that two white venire members who rated law enforcement lower than panel member 13 were not struck by the State and served on the jury, and that one white and one Hispanic juror with panel member 13's same rating were not struck and served on the jury, there were also three white venire members who had law enforcement ratings *higher* than panel member 13 who *were* struck by the State, as well as a white male with the same rating who was struck by the State. Thus, after reviewing the law-enforcement ratings of venire members who were struck by the State, the record reflects that panel members' ratings of law enforcement did not predominate the State's use of peremptory strikes.[7]

---

[7] We note that the prosecutor never referred to the law enforcement rating numbers as a justification for striking anyone. What appeared to be more important to the State was the fact that

11

Finally, Sauls argues that the prosecutor assumed that because panel member 13 had been subject to racial profiling, he would have a bias against law enforcement in general and APD in particular. Sauls asserts that the strike was a pretext for an otherwise unlawful peremptory strike because no effort was made to distinguish between African-Americans who distrust all law enforcement due to their experience of being racially profiled and those African-Americans like panel member 13 who have experienced racial profiling but still trust the police. Thus, according to Sauls, the fifth *Keeton* factor[8] indicates that the State's race-neutral reason was a pretext.

The fifth *Keeton* factor seeks to determine whether the prosecutor provided an explanation for the peremptory strike based on a group bias where the group trait is not shown to apply to the challenged juror specifically. 749 S.W.2d at 868. In *Whitsey*, the court of criminal appeals determined that two black jurors were inappropriately struck on the basis of this factor. 796 S.W.2d at 716. The court noted that in the case of one African-American venire member, the prosecutor said he struck her because he determined she was "liberal" based on her occupation as a teacher. *Id.* He struck another African-American venire member because he determined she was "liberal" based on her husband's occupation as a nurse's assistant. *Id.* The prosecutor did not ask any questions of

_____

panel members 6 and 13 volunteered that they had bad experiences with law enforcement in Travis County, and member 38 expressed the view that law enforcement engages in racial profiling. Given the fact that the prosecutor struck the other white venire member who said he had a negative experience with law enforcement and the white venire member who said the police engage in racial profiling, we cannot conclude that the State treated venire members in a racially disparate manner.

[8] In *Keeton*, six factors were discussed, and the sixth factor has since been referred to as factor number five in subsequent cases. *See Keeton v. State*, 749 S.W.2d 861, 868 (Tex. Crim. App. 1988); *see also Williams v. State*, 804 S.W.2d 95, 106 (Tex. Crim. App. 1991); *Whitsey v. State*, 796 S.W.2d 707 (Tex. Crim. App. 1989). We refer to "an explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically" as the fifth *Keeton* factor as well.

12

either juror, nor did defense counsel, and nothing in the record indicated that these two black prospective jurors were "liberal" based on their occupations. *Id.* The court of criminal appeals described this as a "classic example" of the fifth *Keeton* factor. *Id.*; *see also Keeton*, 749 S.W.2d at 868 (providing as an example of this factor "an assumption that teachers as a class are too liberal, without any specific questions having been directed to the panel or the individual juror showing the potentially liberal nature of the challenged juror").

The distinguishing feature of this case as compared to *Whitsey* is the fact that the "group bias" of the venire member alleged by the prosecutor in *Whitsey* (teachers are liberal) had nothing to do with the case at hand. By contrast, the prosecutor in this case alleged a bias of the venire member relevant to this case—a person who thinks he was racially profiled or had a bad experience with law enforcement will be biased against the testimony of law enforcement. Whereas *Whitsey* exemplifies a classic pretextual explanation for striking a juror for a vague and irrelevant group characteristic, this case does not because the State's proffered reason for striking a juror who expressed a belief that law enforcement had discriminated against him in the past has a close relationship to the testimony in the case.

Moreover, Sauls is essentially asking this Court to raise the standard for a peremptory strike in these situations to the same standard as a strike for cause. If the prosecutor could show that panel member 13 would be biased against law enforcement because of his prior bad experience with the police—which Sauls argues the prosecutor must do to use his peremptory strike—then the prosecutor would also have grounds to strike the venire member for cause. This Court is not obliged to raise the bar that high. As the United States Supreme Court said in *Batson*, "we

13

emphasize that the prosecutor's explanation [for the peremptory strike] need not rise to the level justifying exercise of a challenge for cause." 476 U.S. at 97. As this Court has previously stated, "[p]eremptory challenges exist to allow the parties to strike potential jurors who, while not disqualified or subject to challenge for cause, are for some reason deemed unsuitable by the challenging party." *Anderson*, 2003 WL 21241356, at *1. And as the court of criminal appeals has noted, "we believe that *Batson* leaves room for the State to exercise its peremptory challenges on the basis of the prosecutor's legitimate 'hunches' and past experience, so long as racial discrimination is not the motive." *Keeton*, 749 S.W.2d at 865.

Although panel member 13 said that his prior negative experiences with law enforcement would not impact his views of the police in this case, it was reasonable for the prosecutor to believe that the venire member's prior bad experiences with the police would lead him to distrust police testimony. As such, the State could have reasonably believed that panel member 13 was an unsuitable juror due to a potential bias, and thus could be subject to a peremptory strike. Viewing all of these factors in their totality, we conclude that Sauls has failed to show that the State's proffered race-neutral reason for its peremptory strike was pretextual.

Therefore, based on this record we cannot say that the trial court clearly erred in overruling Sauls's *Batson* challenge. We overrule Sauls's first point of error.

**Clerical Error in the Judgment**

Sauls contends—and the State concedes—that the judgment incorrectly states that Sauls pleaded "true" to the two enhancement paragraphs. The record reflects that Sauls entered

pleas of "not true" to the enhancement paragraphs. The judgment, however, says that he pleaded true to the enhancements, and the trial court found the enhancement paragraphs to be true.

This Court has the authority to modify an incorrect trial court judgment when the necessary information is available to do so. *See* Tex. R. App. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993). Since the necessary information is available here, we modify the judgment of conviction to reflect that Sauls pleaded not true to the two enhancement paragraphs.

## CONCLUSION

Finding no error in the trial court's denial of Sauls's *Batson* challenge, we modify the judgment of conviction as noted above and affirm the judgment as modified.

_____

Scott K. Field, Justice

Before Chief Justice Jones, Justices Goodwin and Field

Modified and, as Modified, Affirmed

Filed:   August 22, 2014

Do Not Publish